1

2            **UNITED STATES DISTRICT COURT**

3               **DISTRICT OF NEVADA**

4

5   CHRISTOPHER A. JONES          )
                                  )        3:04-CV-0426-LRH (VPC)
6        Plaintiff,               )
                                  )
7        vs.                      )        **REPORT AND RECOMMENDATION**
                                  )        **OF U.S. MAGISTRATE JUDGE**
8   MATTHEW L. JENSEN, ET AL.     )
                                  )
9        Defendant.               )        March 29, 2007
    _____)

10

11         This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

12   District Judge.   The action was referred to the undersigned Magistrate Judge pursuant to 28

13   U.S.C. § 636(b)(1)(B) and LR IB 1-4.   Before the court is defendants' motion for summary

14   judgment (#168/169).  Plaintiff opposed (#176), and defendants replied (#181).  For the reasons

15   stated below, the court recommends that defendants' motion for summary judgment (#168/169)

16

17   be granted in part and denied in part.

18              **I.  HISTORY & PROCEDURAL BACKGROUND**

19         Plaintiff Christopher A. Jones ("plaintiff"), a *pro se* prisoner, is currently incarcerated by

20   the Nevada Department of Corrections ("NDOC") at Southern Desert Correctional Center

21   ("SDCC") (#175).  Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging in nine

22   counts that prison officials violated his First, Fifth, Eighth and Fourteenth Amendment rights

23

24   (#13).[1]   Plaintiff names as defendants Matthew Jensen, Nevada Deputy Attorney General;

25   Melanie Mason, NDOC Inmate Services; Albert Peralta, NDOC Chief of Inmate Services; Jackie

26

27         [1] The court finished its initial screening and filed plaintiff's original complaint on January 5, 2005
    (#7).  On the same day, the court issued an order dismissing several counts for insufficiency as a matter of
28   law (#6).  Plaintiff filed his amended complaint on March 9, 2005 (#13), and the court issued an order
    dismissing counts 8, 9 and 10 for failure to state a claim (#15).  On July 12, 2006, plaintiff voluntarily
    dismissed with prejudice count 13 (#151).

Crawford, former NDOC director; Glen Whorton, NDOC director; E.K. McDaniel, Ely State Prison ("ESP") Warden; Craig Farwell, NDOC Acting Assistant Director; Steven MacArthur, former ESP Medical Director; Rod Lightsey, ESP Sergeant of Corrections; Donald Helling, Northern Nevada Correctional Center ("NNCC") Warden; Matt Tilley, NNCC Law Library Supervisor; Greg Cox, NDOC Assistant Director of Operations; Michael Budge, Nevada State Prison ("NSP") Warden; Lt. Roberts, Head of Transportation; Ted D'Amico, NDOC Medical Director; John and Jane Doe 1-50, NDOC Employees; and Ray Williams, Food Services Manager. *Id*.

After dismissals, plaintiff's complaint includes nine counts of alleged constitutional violations, as follows:

- Count 1 – plaintiff alleges that defendants retaliated against him for exercising his First Amendment rights by taking funds from and freezing his inmate account in a manner not approved by Nevada statutory law and NDOC regulations and procedure (*id*, pp. 7-18);

- Count 2 – plaintiff alleges that defendants violated his right to due process with regard to the factual allegations in count 1 (*id*, pp. 19-20);

- Count 3 – plaintiff alleges a state law claim for conversion with regard to the factual allegations in count 1 (*id*, pp. 21-22);

- Count 4 – plaintiff alleges that defendants retaliated against him for seeking legal assistance from the prison law library by inciting an incident with the plaintiff and subsequently writing up and affirming on appeal multiple false notices of charges (*id*, pp. 23-32);

- Count 5 – plaintiff alleges that Administrative Regulation ("AR") 750 allows prison officials to open and read outgoing mail without notice or an opportunity to appeal in violation of his First, Fifth and Fourteenth Amendment rights (*id*, pp. 33-34);

- Count 6 – plaintiff alleges that defendants have opened and read privileged legal mail sent by his "co-plaintiffs" outside of plaintiff's presence in violation of AR 750 and his constitutional rights (*id*, pp. 35-40);

- Count 7 – plaintiff claims that defendants denied him adequate pain medication for a severe back injury during a one-month period beginning on March 19, 2004 (*id*., pp. 41-54);

- <u>Count 11</u> – plaintiff alleges that defendants violated his right to due process when they found him guilty of a disciplinary infraction for fighting in the absence of any evidence to support the charge (*id*, pp. 76-80);

- <u>Count 12</u> – plaintiff alleges that defendants denied him the use of toilet facilities during a lengthy transport from one prison facility to another in violation of his right to be free from cruel and unusual punishment (*id*, pp. 81-84).

The Court notes that the plaintiff is proceeding *pro se*. "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

### A.  Discussion

#### 1.  Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(C).  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, __ U.S. __, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds could differ

on the material facts at issue, however, summary judgment should not be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson*, 477 U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

**B. Analysis**

**1. Counts 1-3**

The facts in counts 1-3 are undisputed.  On November 17, 2003, the state court in *Jones et al. v. NDOC et al.*, CF-0203008, ordered the plaintiffs in that case to pay discovery copying costs to defendants in the amount of $560.25 pursuant to Nevada Rule of Civil Procedure 34 (#168, D-MSJ 49-56).  The state court order did not specify how or when the costs must be paid, however, it stayed discovery until plaintiffs provided payment.  *Id.*, D-MSJ 56.  At the request of defendant Jensen, who at the time was the Deputy Attorney General representing defendants in the state court case, and upon presentation of the court order, NDOC defendants deducted the amount specified from three inmate accounts, one of which was plaintiff's account.  *Id.*, D-MSJ 57-58, 58.01-58.03, 68, and 70.  NDOC defendants took a single deduction from plaintiff's inmate account, leaving him with a zero balance and freezing his account until the debt was paid

4

in full.  *Id.*, D-MSJ 61-62.

### (a) *Younger* Abstention Doctrine

As an initial matter, defendants argue that "Plaintiff has sued Defendants concerning the deduction of funds taken in satisfaction of the State Court Order in the Jones State Litigation," and that because that litigation is pending, the federal court should "abstain from declaring the force, effect, or meaning of that State Court Order" (#168, p. 11).

Had defendants provided evidence to this court that the plaintiff had brought claims in the state court case challenging the manner in which the NDOC removed funds from his account, this court might be inclined to abstain from ruling on counts 1-3.  However, defendants provide no such evidence, such as a complaint or a motion.  While it may be true that plaintiff has brought such claims, this court cannot just take the defendants at their word.  Therefore, the court rejects defendants' *Younger* Abstention Doctrine argument.

### (b) Was the Deduction from Plaintiff's Account Lawful?

This court must first determine whether the deduction from plaintiff's account was lawful pursuant to Nevada statutes and NDOC policy and regulations.

Defendants argue that NDOC took the deduction pursuant to "a lawful court order and the NDOC policy regarding lump-sum deductions for cost-sanction-orders in ongoing civil actions" (#168, p. 20).  Defendants offer the affidavit of defendant Mason, who avers that while particular NDOC regulations apply to limit the monetary deductions from inmates' accounts for "post-conviction and post-judgment" debts, these regulations did not "expressly" apply to "interlocutory court orders" such as the one at issue here (#168, D-MSJ 200-201, ¶¶ 7-9).  Therefore, NDOC's policy at the time "allowed for deductions to be made for interlocutory, court-ordered sanctions at an accelerated schedule."  *Id.*, ¶ 9.

5

Plaintiff contends that the state court order was not a sanction, but a discovery cost order pursuant to NRCP 34(d) (#176, pp. 1-2). Furthermore, the processes to access inmate funds are controlled by well-established state law procedures that the prison failed to follow. *Id*. Plaintiff argues there is an issue of fact as to which entity actually incurred the copy costs – the Attorney General's office or NDOC. *Id*., p. 4. This fact is material because defendants have claimed that the state statutes governing deductions from inmate accounts do not apply to this situation because the monies were owed to a third party, namely the Attorney General's office. *Id*. However, plaintiff argues that it was NDOC that incurred the copy fees, and as such, the applicable statutes are those pertaining to repayment to NDOC for costs incurred by the department. *Id*. Plaintiff additionally argues that in contravention to their responses to his administrative grievances in which defendants stated that the deduction was taken pursuant to the state statutes and prison regulations, defendants now claim that these statutes and regulations are inapplicable. *Id*., p. 23.

The statutes and regulations at issue here are N.R.S. 209.246, N.R.S. 209.247, N.R.S. 209.2475, N.R.S. 209.463, Administrative Regulation ("AR") 258, and Internal Procedures ("IP") SS-0010 and IP SS-0011. N.R.S. 209.246 requires NDOC to establish regulations for the "reasonable" deduction from money credited to an inmate account to, among other things, "repay costs incurred by the department on behalf of the offender for (a) ... items related to litigation; (b) photocopying... legal documents... ."[2] N.R.S. 209.247 and N.R.S. 209.463 provide an order of priority for deductions from inmate non-wage and wage sources. Each section states, "*except as provided in N.R.S. 209.2475*," the NDOC may make deductions in a certain priority as listed in

---

[2] N.R.S. 209.246 includes a number of other permissible deductions; however, the court lists only those potentially relevant to this case.

6

each statute (emphasis added).[3]  N.R.S. 209.2475 states:

> The director *shall not make any deduction* from the individual account of an inmate offender in the prisoner's personal property fund if the balance in the account is below the minimum balance designated by the director pursuant to this subsection.   The director *shall* designate the minimum balance of an account of an offender required before such other deductions or withdrawals from the account may be made by the director or the offender.

N.R.S. 209.2475(1) (emphasis added).

AR 258 incorporates the priority of deduction language of N.R.S. 209.247 and 209.463 without setting actual percentages for each category, and additionally incorporates the minimum balance language of N.R.S. 209.2475 without setting an actual minimum balance amount ( #168, D-MSJ 208-211).  IP SS-0010 and IP SS-0011 involve the priority of deductions from inmate non-wage and wage sources. *Id*., D-MSJ 221-229 and 230-239.  IP SS-0011 establishes that fifty-percent of deposits received from non-wage sources will automatically be taken to satisfy "costs incurred by the department on behalf of the inmate per N.R.S. 209.246." *Id*., D-MSJ 230.  IP SS-0010 establishes the same fifty-percent deduction from wage sources for "costs incurred by the department on behalf of the inmate per N.R.S. 209.246," and additionally states that "deductions will not exceed 80% of the gross wages." *Id*., D-MSJ 221.  Neither IP sets a minimum balance dollar amount for inmate accounts as required per N.R.S. 209.2475.[4]

Defendants argue that while IP SS-0011 does require that "fifty percent (50%) of deposits received from non-wage sources will automatically be taken to repay costs incurred by the department on behalf of the inmate, per N.R.S. 209.246," the fifty-percent "is not a cap, but a

---

[3] A careful review of  N.R.S. 209.247 and 209.463 reveals that none of the categories of deductions listed appears to fit the factual situation in this case; thus, the court need not list them here.

[4] It may be that NDOC has set a minimum dollar amount for inmate accounts pursuant to N.R.S. 209.2475; however, this information is not currently before the court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*minimum* deduction" (#168, p. 26) (emphasis in original).  Defendants reason that this is because IP SS-0011 does not refer to N.R.S. 209.2475, which is the only statute that requires a minimum balance in inmate accounts.  *Id*.  Defendants further argue that N.R.S. 209.246 does not apply to the facts of this case because the funds in this case were taken pursuant to an interlocutory court order for costs in a civil litigation, not for one of the enumerated reasons listed in N.R.S. 209.246. *Id*.  Additionally, defendants argue that IP SS-0011 only discusses automatic deductions *before* funds are deposited in the account; since the funds deducted from plaintiff's account were *already in* his account, defendants argue that IP SS-0011 does not apply.

First, although plaintiff argues that there is an issue of fact as to whether NDOC or the Attorney General's office incurred the copy costs, the court finds this is irrelevant.  N.R.S. 209.246 provides that an inmate must repay costs incurred by NDOC "on behalf of" the inmate for legal copies or litigation costs.  N.R.S. 209.246(3)(a)-(b).  This appears to be based on the fact that NDOC completed the work or advanced money for the inmate's benefit.  That is a different situation from the current case, in which a state court ordered a plaintiff to pay discovery costs to a defendant for documents plaintiffs requested and defendants produced.  NDOC did not incur costs "on behalf of" plaintiff in the state case; rather, plaintiff owed the defendants in the case – who also just happen to be NDOC – discovery costs in a civil litigation pursuant to the Nevada Rules of Civil Procedure.  Merely because NDOC happens to be the defendant in the state case does not implicate N.R.S. 209.246; a reasonable interpretation of N.R.S. 209.246 is that the reimbursement provisions are meant to reimburse NDOC for its expenses as plaintiff's "jailor."  Therefore the court concludes that N.R.S. 209.246 does not apply here.

Nor do N.R.S. 209.247 or 209.463 apply here.  Neither statute refers to a deduction for an interlocutory civil court order regarding discovery costs.  Thus, neither IP SS-0010 (applying

8

section 209.463) and IP SS-0011 (applying section 209.247) apply.

However, N.R.S. 209.2475 does apply.  As noted above, this section contains mandatory language, which states "the director *shall not make any deduction*" if the balance in an inmate account is below the minimum balance specified by the director.  N.R.S. 209.2475(1) (emphasis added).   The director "*shall* designate the minimum balance" for inmate accounts before deductions may be taken.  *Id.* (emphasis added).  NDOC *must* designate a minimum balance and *cannot* make deductions below such balance pursuant to N.R.S. 209.2475(1).  Nowhere in the mandatory language of N.R.S. 209.2475 does exclude interlocutory court orders.  Notwithstanding the defendants' interpretation of the statutes and regulations, by definition, the term "any" includes interlocutory court orders.

Neither party has presented evidence of a minimum balance set by NDOC to this court.  However, the court surmises that regardless of how low it is, any minimum balance would certainly be more than zero.  Therefore, the court concludes that, as a matter of law, the deduction of *all* funds from plaintiff's account, leaving him with a zero balance, was unlawful because it violated the mandatory provisions of N.R.S. 209.2475.

### (c) Merits of Counts 1-3

### (1) Count 1

In count 1, plaintiff alleges that defendants Jensen, Peralta, Mason, and Rexwinkle retaliated against him for exercising his First Amendment rights by taking funds from and freezing his inmate account in a manner not approved by Nevada statutory law and NDOC regulations and procedure (#13, pp. 7-18).  Plaintiff alleges that defendant Jensen contacted the other defendants in Inmate Services and "directed/ordered" them to take one hundred percent of the funds in plaintiff's account to satisfy the state court's order.  *Id.*, p. 10.  Plaintiff alleges that

9

defendants' actions chilled his First Amendment activities because he was unable to "order and pay for discovery as outlined in the order dated Nov. 17, 03," nor was he able to purchase stamps or legal supplies. *Id*., p. 15.

Defendants argue that there is no proof that the deduction was taken from plaintiff's account in retaliation for plaintiff's pursuit of his state court case. First, Jensen, Peralta, Mason, and Rexwinkle were not defendants in the state court case. Second, there was no cause in the state court case for any of these defendants to retaliate against plaintiff, and third, these defendants were not even local prison officials, but were administrative personnel in Carson City. *Id*., pp. 20-21. Defendants also contend that plaintiff cannot demonstrate that there was no legitimate penological reason to deduct the funds from his account in a lump sum, rather than over a period of time. *Id*.

Plaintiff claims that defendant Jensen only froze his funds in retaliation for plaintiff's motion to have the defendant's answers stricken due to discovery violations in the state court case (#176, p. 3).

**a. First Amendment Retaliation**

Prisoners have a right to meaningful access to the courts, and prison authorities may not penalize or retaliate against an inmate for exercising this right. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995). Prison officials may be sued under Section 1983 for retaliating against a prisoner for exercising his or her constitutional rights. *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995). A retaliation claim involves five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68

(9th Cir. 2004).  Retaliation claims must be evaluated in light of the deference accorded to prison officials.  *Id*. at 807.

### b. Count 1 Analysis

Because the court concludes above that defendants violated N.R.S. 209.2475 in deducting plaintiff's funds below the minimum balance specified by the NDOC, whatever that amount is, plaintiff has met the adverse action element.  However, there is no evidence at all before this court of retaliation by any of the defendants.  Defendants Peralta, Mason, and Rexwinkle are located in NDOC's central administrative office.  Each defendant appears to have been merely deducting funds from plaintiff's account pursuant the state court order.  Even if these defendants did so in violation of N.R.S. 209.2475, there is no evidence that any of these defendants knew plaintiff or had any retaliatory motive.  Nor is there evidence before the court which indicates defendant Jensen retaliated against plaintiff.  While plaintiff alleges that defendant Jensen engaged in abusive collection practices in retaliation for motions plaintiff filed in the state court case, *see* #176, p. 3, there is absolutely no evidence to indicate that this incident was anything other than normal litigation practice between parties.

Because the plaintiff cannot meet elements two and three of his retaliation claim, the court grants summary judgment on count 1.

### (2) Count 2

In count 2, plaintiff alleges that defendants Jensen, Peralta, Mason, and Rexwinkle violated his right to due process based on the same facts in count 1 (#13, pp. 19-20).

Defendants argue that because plaintiff has an adequate post-deprivation remedy, namely plaintiff's conversion cause of action in count 3, plaintiff cannot bring a federal procedural due process claim (#168, p. 22).  Defendants maintain that in any event, plaintiff *did* receive adequate

11

procedural due process in the state court litigation, because he was given notice and an opportunity to be heard on the issue of whether he should have to pay defendants' copy costs. *Id.*, pp. 22-23. The state court stayed discovery in that case until plaintiff paid the expenses; therefore, plaintiff was on notice that the prison would deduct the funds "very soon" from his account to assure that the litigation moved along quickly. *Id.*, p. 23.

Plaintiff counters that he has a protected property interest in the funds in his inmate account, was owed due process, and that the defendants took the deduction from his account in violation of state law. *See generally* #176, p. 1-6, 20, 22-24.

### a. Due Process

An inmate has a constitutionally protected property interest in the funds in his prison account. *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1984); *see also Scott v. Angelone*, 771 F.Supp 1064, 1067 (D. Nev. 1991). Once a protected interest is found, the court need only decide what process is due under the Fourteenth Amendment. *Quick*, 754 F.2d at 1523. This is a question of law. *Id*.

The law provides that no due process violation occurs if the government *negligently* deprives an inmate of his protected property. *Daniel v. Williams*, 474 U.S. 327 (1986) (*overruling Parratt v. Taylor*, 451 U.S. 527 (1981). The Supreme Court has also held that an *unauthorized intentional* deprivation of property by a state employee does not constitute a violation the Fourteenth Amendment's procedural due process requirements provided the state makes available a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). However, "postdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure rather than random and unauthorized action." *Id*. at 532.

**b. Count 2 Analysis**

Defendants initially argue that plaintiff is procedurally barred from bringing his due process claim because he has an adequate post-deprivation remedy – the count 3 conversion claim (#168, p. 22, *citing Hudson v. Palmer*, 468 U.S. 517, 533 (1984)).  Plaintiff asserts that post-deprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state policy, rather than random and unauthorized action (#176, p. 20).

By defendants' own admissions, defendants made the deduction from plaintiff's inmate account pursuant to prison policy.  Defendants have argued that they believed they were permitted to make "lump-sum" deductions at the time (#168, p. 24 ("NDOC has a reasonable policy for processing interlocutory court orders for fees, costs, and sanctions sooner than the time frames envisioned by AR 258, IP SS-0010, and SS-0011"); *see also* #168, p. 24, n. 97, *citing* D-MSJ 200-201).  This policy was based on defendants' determination that the statutes and regulations governing deductions from inmate accounts did not apply to interlocutory court orders (#168, D-MSJ 200-201, ¶ 9 ("ISD policy, existing at the time of the Deduction, allowed for deduction to be made for *interlocutory*, court-ordered sanctions at an accelerated schedule...")).  Based on defendants' representations to this court, the court concludes that this is not a "random and unauthorized action;" rather, the defendants made the deduction pursuant to prison policy.  Therefore, any post-deprivation remedy does not satisfy due process and plaintiff's claim is not procedurally barred by the rule in *Hudson*.

Next, defendants argue plaintiff received adequate due process in the state court case because he was heard on the issue of whether he would have to pay discovery costs.  However, this contention misses the point of plaintiff's claim, which is that he did not receive due process

13

before the funds were removed from his account, not that he failed to receive due process in relation to the state court's order to pay costs.  Moreover, even if plaintiff knew the funds would be deducted "very soon" after the court issued its order, he was not on notice that defendants would deduct *all* the funds from his account and freeze it.

Defendants also argue that if the court determines that they were wrong to deduct the entire amount in one lump-sum, defendants are entitled to qualified immunity (#168, p. 24, 28-29).  Defendants contend that plaintiff's right to hold onto his funds was not clearly established such that a reasonable official would have understood that he or she was violating plaintiff's rights, and that any mistake was reasonable considering the court order and the fact that time was of the essence in the state court litigation.  *Id.*, p. 28.

The defense of qualified immunity protects state officials sued in their individual capacities unless the conduct complained of violates a clearly established constitutional or statutory right of which a reasonable person would have known.  *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001).  A qualified immunity analysis begins with a threshold question of whether, based upon facts taken in the light most favorable to the party asserting the injury and in light of such clearly established law, an official's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If no constitutional right was violated, the court need not inquire further.  *Id*.  However, if a constitutional violation occurred, the court's second inquiry is whether the official could nevertheless have reasonably, but mistakenly, believed that his or her conduct did not violate a clearly established constitutional right.  *Id*.

It is clearly established that plaintiff has a property interest in the funds in his inmate

account.  *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1984).[5]  It is also clearly established that, pursuant to N.R.S. 209.2475, NDOC *must* designate a minimum balance for inmate accounts and *cannot* make deductions below such balance.  N.R.S. 209.2475(1).  Defendants deducted the money pursuant to prison policy (#168, D-MSJ 200-201, ¶ 9).  The court concludes the defendants have failed to demonstrate that they did not violate plaintiff' constitutional rights by depriving plaintiff of all of his inmate account funds without due process.

The next inquiry is whether defendants nevertheless, reasonably, but mistakenly, believed that their conduct did not violate plaintiff's rights.  Defendants contend that the statutes and prison regulations do not clearly apply on their face to this situation, that any mistake would have been reasonable given the court order and the discovery stay, and it was NDOC's policy to take a lump-sum.  Defendants assert that they reviewed all the relevant statutes and prison regulations, including AR 258, which codifies N.R.S. 209.2475.  Although defendants argue that they reasonably determined that none of the statutes and regulations at issue were applicable to interlocutory court orders, the court concludes above that the term "any" in N.R.S. 209.2475 clearly includes interlocutory court orders.  Considering the mandatory language and the fact that defendants state they reviewed the relevant statutes, the court finds there is an issue of fact as to whether the defendants acted with a reasonable belief.  The court denies summary judgment on count 2.

///

---

[5] Based on the holding in *Quick*, the court rejects defendants' argument that there was no "deprivation" of a property interest (#168, p. 23).  Defendants claim that because the debt owed by the plaintiff to the defendants was lawfully established by court order, plaintiff had no right to keep the funds in his inmate account.  It is possible, although admittedly unlikely, that this debt could have been paid in ways other than through plaintiff's inmate account.  Therefore, the argument that the mere existence of the state court order means that plaintiff lost his constitutional property interest in his inmate account funds is unsupported – the court order did not specifically state that the funds must come from plaintiff's inmate account, nor did it direct that all of the funds be paid at once.

15

### (3) Count 3

In count 3, plaintiff alleges a state law claim for conversion regarding the factual allegations in count 1 (#13, pp. 21-22).

Defendants contend they are statutorily immune from liability in relation to count 3 because they used their discretion in interpreting the state court's order as one that required immediate payment. *Id*., pp. 13-15 and p. 27, *citing* N.R.S. 41.031 and N.R.S. 41.032.

Plaintiff argues that the Nevada Supreme Court has stated that the distinction between discretionary and ministerial functions is "obscure" and that the statutes and regulations which govern deductions from inmate accounts set out operational functions (#176, p. 19, *citing State v. Silva*, 478 P.2d 591, 592 (1971)).

### a. Statutory Immunity

Pursuant to N.R.S. 41.031, the State of Nevada has generally waived its immunity from suit, subject to certain exceptions. N.R.S. 41.031(1). N.R.S. 41.032 provides immunity to state officials exercising or performing, or failing to exercise or perform, a "discretionary function or duty," whether or not the discretion involved is abused. N.R.S. 41.032(2). A "discretionary act" is one "which requires 'exercise of personal deliberation, decision and judgment.'" *Ortega v. Reyna*, 114 Nev. 55, 62 (1998), *citing Travelers Hotel v. City of Reno*, 103 Nev. 343, 345-46 (1987). Examples of discretionary acts have included "a decision not to respond to a citizen's report of a person in distress and a decision to construct a parking lot, freeway, or crosswalk." *Univ. of Nevada, Reno v. Stacey*, 116 Nev. 428, 434 (2000). A ministerial act is "an act performed by an individual in a prescribed legal manner in accordance with the law, without regard to, or the exercise of, the judgment of the individual." *Foster v. Washoe County*, 114 Nev. 936, 942 (1998). "A ministerial act envisions direct adherence to a governing rule or standard

16

with compulsory result." *Id.* (citations omitted).

### b. Count 3 Analysis

There are no state statutes or regulations that *compelled* defendants to deduct the funds from plaintiff's account.  The state court order did not specify how the plaintiffs were to pay the discovery costs, nor did it specify a time frame in which the costs had to be paid.  These decisions were left up to the defendants in this case.  Defendants had the discretion to wait until plaintiff had enough money in his account to cover the discovery costs.  Defendants also could have made inquiries of plaintiff of other sources of funds to pay the state-ordered costs.  The fact that the defendants could exercise "personal deliberation, decision and judgment" over when and how to withdraw the funds makes this act discretionary.  *Foster v. Washoe County*, 114 Nev. 936, 941 (1998) (The key question in determining statutory immunity is whether the act of deducting the funds from plaintiff's account was discretionary or ministerial).

The court concludes that the defendants acts were discretionary and that they are entitled to immunity pursuant to N.R.S. 41.032(2).  The court grants summary judgment on count 3.

### 2. Count 4

In count 4, plaintiff alleges that defendants Lightsey, McDaniel, and Whorton retaliated against him for seeking legal assistance from the prison law library (#13, pp. 23-32).  On April 15, 2003, plaintiff submitted an interview request form to an inmate law library employee named William Barry (#168, D-MSJ 93).  The kite states:

> I have been receiving a "hundred and one" excuses as to why I am not being sent Title 11 USC, copy work and legal supplies.  In fact, I've received no books since 4-8-03.  What is the status of Title 11 USC?  Also, was the photocopier broken on 4-15-03?
>
> If you don't answer this kite in your own handwriting I will assume you did not get it and thus, will have a good idea as to what is going on.  Also, please shep N.R.S. 11.207(2) for me.

17

*Id.* Plaintiff alleges that on April 16, 2003, defendant Lightsey – whose wife is the ESP law librarian – "confronted" him in an attempt to "incite" plaintiff, and "proceeded to scold, admonish and rebuke" him for questioning the law library staff's veracity in his kite (#13, pp. 23-32). Plaintiff alleges that although he did not use any abusive language, defendant Lightsey charged plaintiff with abusive language anyway, and defendants McDaniel and Whorton upheld the charges on appeal. *Id.* Plaintiff alleges that on May 26, 2003, defendant Lightsey "continued his retaliation" by filing "false" charges that accused plaintiff of failing to obey an order to clear his window, failure to follow the rules, and abusive language. *Id.*, p. 29. Defendants McDaniel and Whorton upheld the appeal on this charge as well. *Id.*, p. 31.

Defendants concede that defendant Lightsey attempted to "counsel Plaintiff for sending an inappropriate 'kite' to the ESP law library" (#168, p. 29). Defendants contend that the plaintiff's kite was inappropriate because it contained a message to an inmate in the law library, rather than a request to the law library in general. *Id.* Defendants argue that plaintiff was not written up for what he wrote in the kite, but for his abusive language to defendant Lightsey after Lightsey spoke with him; therefore, the "factual predicate for the so-called 'retaliation' was not Plaintiff's first amendment right to obtain legal assistance, but rather, Plaintiff's verbal abuse, which is disallowed in the prison setting." *Id.*, pp. 29-30. Defendants claim that plaintiff also cannot prove that defendant Lightsey's actions were not for the legitimate penological purpose of maintaining order and discipline. *Id.*, p. 30. Defendant Lightsey makes similar arguments with relation to the second allegation of retaliation on May 26, 2003. *Id.*, p. 31.

Plaintiff responds that he was not prohibited from addressing a kite to a particular law clerk, and in fact, had engaged in this practice numerous times (#176, p. 6). Plaintiff contends that defendant Lightsey's "sole" motivation for confronting him was because plaintiff questioned

18

the truthfulness of defendant Lightsey's wife.  *Id*., p. 7.  Plaintiff argues that the incident was instigated by defendant Lightsey and the charges were pretextual because plaintiff never swore at the defendant and the charges were later reduced.  *Id*.

### (a) First Amendment Retaliation

The elements of a First Amendment retaliation claim were set out above in count 1.  *See supra*, p. 11.

### (b) Count 4 Analysis

It is undisputed that plaintiff submitted a kite to a law library staff inmate complaining he was not receiving requested materials and questioning the truthfulness of information given to him by other law library staff (#168, D-MSJ 93).  On April 16, 2003, defendant Lightsey spoke with plaintiff regarding this kite.  *Id*., D-MSJ 90-91, Request For Admissions No. 45 (""Defendant Lightsey then took the kite to plaintiff, where he informally counseled Plaintiff for improperly sending the kite to the library").  After this conversation defendant Lightsey wrote a disciplinary charge  against the plaintiff for abusive language.  *Id*., D-MSJ 94.  Plaintiff denied any wrongdoing, the charges were reduced, and plaintiff received a verbal reprimand.  *Id*., D-MSJ 95.  The notice of charges was upheld on appeal.  *Id*., D-MSJ 96-98.  A second incident occurred on May 26, 2003, wherein defendant Lightsey asked plaintiff to remove something from his cell window.  *Id*., D-MSJ 99.  After this encounter, plaintiff was charged with four disciplinary violations, two of which were dismissed, two of which resulted in minor punishment.  *Id*., D-MSJ 100.  The notice of charges was upheld on appeal.  *Id*., D-MSJ 101.

The court concludes there is a genuine issue of material fact as to defendant Lightsey's motive behind his accusations of plaintiff's rule violations.  First, plaintiff alleges that he was trying to access the law library and its copy machine, and believed that defendant Lightsey's wife

19

and/or her staff denied him access.  It is undisputed that the status of the copy machine is a legitimate concern to an inmate wishing to obtain legal copy work (#176, Ex. 119, RFA No. 20). Plaintiff has a constitutional right to access to the prison law library.  *Vandelft v. Moses*, 31 F.3d 794, 796 (9th Cir. 1994).

Next, plaintiff alleges that defendant Lightsey confronted him solely to provoke abusive language in retaliation for drafting a kite questioning the truthfulness of defendant Lightsey's wife.  It is not clear what occurred when defendant Lightsey attempted to "counsel" plaintiff, however, it is clear that defendant Lightsey spoke to the plaintiff shortly after plaintiff engaged in protected conduct.  Plaintiff's kite happened to implicitly criticize defendant Lightsey's wife. Defendant Lightsey claims his justification for "counseling" plaintiff was because plaintiff's method of kiting the law library through an inmate law clerk was improper.  *See* #168, p. 29. However, plaintiff has presented evidence that he has on many other occasions directly contacted other law library staff inmates via kites without incident, *see* #176, Ex. 117, and defendants have not refuted this.  The Ninth Circuit has recognized that "timing can properly be considered as circumstantial evidence of retaliatory intent."  *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). Because there exists a material issue of fact as to whether defendant Lightsey's motive was retaliatory, the court denies summary judgment on count four as to defendant Lightsey.

However, there is no evidence before the court that defendants McDaniel or Whorton acted with retaliatory motive.  Supervisory officials are not liable for the actions of subordinates under a vicarious liability theory pursuant to 42 U.S.C. § 1983 unless "the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001).  In this case, there is no evidence before the court that defendants McDaniel and

20

Whorton "knew" that defendant Lightsey had acted in a retaliatory manner and subsequently affirmed the actions, nor is there evidence that either of these defendants acted in a retaliatory manner themselves.   Therefore, the court grants summary judgment on count four as to defendants McDaniel and Whorton.

### 3. Count 5

In count 5, plaintiff challenges the constitutionality of certain provisions in AR 750 allowing prison officials to open and read outgoing inmate mail without notice or an opportunity to appeal (#13, pp. 33-34).   Plaintiff alleges these provisions violate his First, Fifth and Fourteenth Amendment rights.  *Id.*[6]

AR 750 defines "censorship" as:

> The intent to suppress or delete anything considered objectionable under this regulation.  Censorship may include, but is not limited to:
>
> • Deleting portions of a letter
> • Returning the letter either in its entirety or in part to the sender
> • Removing printing or pictures, adulterated mail or rendering any portion of the contents unintelligible.

(#168, D-MSJ 103).  AR 750 defines "monitoring" as "[t]he reading of general correspondence as part of an ongoing investigation."  *Id.*, D-MSJ 104.  "General Correspondence" is defined as "mail between an inmate and someone other than those approved for privileged correspondence."

---

[6] Plaintiff contends in his opposition that count 5 also includes a claim that defendants opened and read his outgoing legal mail, which was clearly marked "confidential," and which requires more protection than outgoing regular mail (#176, p. 24).  A careful review of count 5 reveals that plaintiff challenges only the constitutional validity of the provision of AR 750 that pertains to "outgoing personal/general mail" (#13, p. 33; *see also id.*, p. 34, ¶ 76 ("condoning the reading of *outgoing general correspondence* without notice") (emphasis added)).  Plaintiff has alleged no facts in count 5 to support a claim that defendants monitored his outgoing legal or privileged mail.  This conclusion is further supported by plaintiff's grievances, which specifically refer to "AR 750.05" (relating to outgoing general mail), and contain no references to legal mail (#168, D-MSJ 119-121).

21

*Id.*, D-MSJ 103.  "Privileged Correspondence" is mail between an inmate and a specific list of individuals, including attorneys, elected and appointed officials, judges, parole and probation supervisors, wardens and assistant wardens, and co-defendants or co-plaintiffs in litigation.  *Id.*, D-MSJ 104.

The provision at issue here is AR 750.05, entitled "Monitoring of Inmate General Correspondence and Mail."  *Id.*, D-MSJ 112-113.  This section provides that prison staff may "monitor" incoming and/or outgoing mail when "there is a reasonable suspicion that it contains evidence of criminal activity or activity that is a threat to the safety and security of the institution/facility."  *Id.*, D-MSJ 112.  All requests to monitor mail must be submitted in writing for approval by the Warden.  *Id.*  The request must contain the basis for the monitoring and the approximate length of time the prison will monitor the inmate's mail.  *Id.*  Prison staff is required to keep a log of all monitored mail with the inmate's name and institutional number, the staff person who authorized the monitoring, the date the prison monitored the mail, and the name of the staff person authorized to monitor the mail.  *Id.*, D-MSJ 113.  The provision states that mail may be copied before forwarding the original, and that while mail "shall not be held more than twenty-four hours," if the prison holds it longer than twenty-four hours, "censorship procedures must be followed."  *Id.*  AR 750.05.1.6 specifically states that it does not apply to legal correspondence.  *Id.*

Defendants acknowledge that inmates have a due process right to be notified when mail is "withheld" by prison authorities, but argue that "the mere reading, without withholding, of suspected mail" does not require such notification pursuant to constitutional law (#168, pp. 31-32).  Defendants' position is that prisoners have no property or liberty interest in being notified when suspicious mail is being monitored prior to charges being brought against them, but contend

22

that nevertheless, AR 750 itself constitutes advance notice that mail may be monitored.  *Id.*, p. 32.  Defendants further argue that even if there is a constitutional right to notification prior to mail "monitoring," a prison may adopt regulations that infringe upon an inmate's constitutional rights so long as those regulations are "reasonably related to legitimate penological interests." *Id.*, *citing Turner v. Safley*, 482 U.S. 78, 89 (1987).  Defendants contend that the prevention of criminal activity and the maintenance of prison security are legitimate reasons to regulate both incoming and outgoing mail and that the absence of a notification provision in AR 750 for outgoing mail monitoring serves the legitimate purposes of (1) keeping ongoing investigations secret until charges are brought, and (2) conserving prison staff resources.  *Id.*, p. 33.  There is no ready alternative to inform a prisoner the prison is monitoring his mail while still keeping a criminal investigation secret.  *Id*.

Plaintiff maintains that defendants have not demonstrated that plaintiff was part of an ongoing criminal investigation in order to justify their actions, and that outgoing mail is entitled to more protection than incoming mail because outgoing mail is less of a threat than incoming mail.  *Id.*, p. 25.  Defendants reply that they need not provide proof that plaintiff was the subject of an investigation because plaintiff is attacking the validity of AR 750 on its face, rather than as-applied to the plaintiff (#181).

### (a) Outgoing Mail

### (1) Fourteenth Amendment Procedural Due Process

The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only when a constitutionally-protected liberty interest is at stake.  *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1995), *citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).  Liberty interests can arise both under the Constitution and from state law.  *Wolff*, 418 U.S. at 557-58.

With respect to liberty interests created under the Constitution, the Supreme Court has held that prisoners have a Fourteenth Amendment liberty interest in "uncensored communication by letter," although this interest is "qualified of necessity by the circumstance of imprisonment." *Procunier v. Martinez*, 416 U.S. 396, 417-18 (1974) (*overruled on other grounds by Turner v. Safely*, 482 U.S. 78 (1987)).   Any decision to censor or withhold delivery of mail must be accompanied by "minimum procedural safeguards," such as notice and an opportunity to appeal. *Martinez*, 416 U.S. at 418.   The Ninth Circuit "has repeatedly acknowledged that withholding delivery of inmate mail must be accompanied by the minimum procedural safeguards" established in *Martinez*. *Krug v. Lutz*, 329 F.3d 692, 697-98 (9th Cir. 2003), *citing Sorrels v. McKee*, 290 F.3d 965, 972 (9th Cir. 2002) and *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001).

Regarding state-created liberty interests, the Supreme Court has held that states may under some circumstances create liberty interests protected by the Due Process clause, but that those liberty interests "will be generally limited to freedom from restraint which... impose[s] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

### (2) First Amendment Rights in Relation to Inmate Mail

Generally, prisoners have "a First Amendment right to send and receive mail." *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995) (per curium).   However, a "delicate balance" must be stricken between prisoners' First Amendment rights and the discretion given to prison administrators to govern the order and security of the prison. *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989).

In *Martinez*, the Supreme Court held that prison regulations concerning mail must further "important or substantial governmental interest[s] unrelated to the suppression of expression" and

24

must be generally necessary to protect legitimate government interests. *Martinez*, 416 U.S. at 413. However, in *Turner*, the Supreme Court set out a different standard of review from *Martinez*, stating that the relevant inquiry is whether mail regulations are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Because of this apparent conflict, the Supreme Court clarified in *Thornburgh* that the *Martinez* standard was limited to outgoing mail. *Thornburgh,* 490 U.S. at 406. The court stated, "[w]e acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence." *Id*. Prison officials have more leeway with regards to incoming mail than outgoing mail due to a greater security risk inherent in materials coming into a prison. *Id.* at 413 ("The implication of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials"); *see also Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995).

The *Martinez* court additionally stated that prison officials may justifiably censor outgoing mail concerning escape plans, information about proposed criminal activity, or the transmittal of encoded messages. *Martinez*, 416 U.S. at 413; *see also* Thornburg, 490 U.S. at 412. Prison officials may also visually inspect out-going mail to determine whether it contains contraband material which threatens prison security or material threatening the safety of the recipient. *Witherow*, 52 F.3d at 266.

### (b) Count 5 Analysis

There is no issue of fact here since plaintiff is making a facial challenge to the constitutionality of AR 750.05.

Plaintiff's main contention is that because "monitoring" is defined by NDOC as "reading" inmate mail, this constitutes mail "censorship," which requires notice and an opportunity to

appeal pursuant to Supreme Court case law (#176, pp. 24-25).[7]  Defendants concede that inmates have due process rights when mail is *withheld*, but do not have such rights for the "mere reading without withholding of suspected mail" because inmates share no liberty interest in being notified if mail is read (#168, pp. 31-32).[8]  Defendants proceed to argue that even if inmates have a constitutional right to notification, *Turner* applies to AR 750 to justify such action.

### (i) Fourteenth Amendment Due Process Rights

Inmates have no state-created liberty interest in AR 750.  *Witherow v. Crawford*, 468 F.Supp.2d 1253, 1266 (D. Nev. 2006).  Nonetheless, inmates do have a liberty interest, albeit qualified by the fact of incarceration, grounded in the First and Fourteenth Amendments in "'uncensored communication by letter.'"  *Krug v. Lutz*, 329 F.3d 692 (9th Cir. 2003) (citations omitted).  Therefore, inmates are owed the minimum due process the constitution requires if their mail is "censored."

Plaintiff maintains that the prison is attempting to get around the notice and appeal requirements by calling what they do "monitoring" rather than "censorship."  However, these two words have different meanings.  "Censorship" is defined as "the actions or practices of censors."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 361 (2002). A "censor" is defined as "[a]n official empowered to examine written or printed matter... in order to forbid publication, circulation, or representation if it contains anything objectionable."  *Id*.  To "monitor" is defined

---

[7] Plaintiff cites no case law to support his contentions.

[8] Defendants cite *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9 Cir. 1996) for the proposition that the reading of all inmate mail is permitted without notice.  *O'Keefe* does not stand for this proposition.  In *O'Keefe*, the issue was whether the prison regulations' failure to treat certain types of mail as "legal mail" was valid.  *O'Keefe*, 82 F.3d at 323.  The court noted that the regulations in *O'Keefe* allowed the prison mail room to "open and read incoming and outgoing regular mail, before distributing and sending it, to prevent criminal activity and to maintain prison security."  *Id*.  The Ninth Circuit specifically stated that it "express[ed] no opinion concerning the validity" of those regulations as it was only addressing the definition of "legal mail."  *Id*., n.1.

as "to watch, observe, or check especially for a special purpose" or "to keep track of, regulate, control." *Id*. at 1460. Censorship, by definition, means that prison officials prevent some or all of an inmate's mail from reaching its destination, while monitoring does not.

The cases this court reviewed involved the *withholding* of mail or the *censorship* of mail, rather than the general reading and forwarding on of inmate mail. *See Martinez*, 416 U.S. at 417-18; *Turner*, 482 U.S. 78; *Thornburgh*, 490 U.S. at 406; *Krug*, 329 F.3d 692; *Sorrels*, 290 F.3d 965; *Prison Legal News*, 238 F.3d 1145. Plaintiff has not cited any case that prohibits prison officials from reading and then forwarding into the general mail stream mail from an inmate who may be implicated in criminal activity. AR 750.05 permits only reading upon "reasonable suspicion" of criminal activity; it does not permit "censorship" because the mail is not withheld, deleted, removed, or returned to the sender. Prison officials read the mail in search of criminal activity only if approved by the Warden, and then send it along; therefore, the mail arrives at its destination intact, despite the prison's monitoring policy.

The court concludes that while an inmate has a liberty interest in sending and receiving mail that has not been changed, deleted, removed or outright prohibited, the Supreme Court has never stated that inmates have a liberty interest in sending mail that has not been read pursuant to a criminal investigation. Since plaintiff has no liberty interest here, he is owed no procedural due process rights under the Fourteenth Amendment.

### (ii) First Amendment Rights

The court concludes that the regulation at issue does not violate plaintiff's First Amendment rights under the *Martinez* standard.[9] *Martinez*, 416 U.S. at 417-18 (outgoing mail

---

[9] Although defendants' contend that *Turner* applies, it is of no matter because the regulation is valid under *Martinez*, which is a more stringent standard.

27

regulations must further "important or substantial governmental interest[s] unrelated to the suppression of expression" and must be generally necessary to protect legitimate government interests).

AR 750.05 serves an important governmental interest. Prison officials have the difficult job of keeping security and order within institutions historically and oftentimes rife with criminal activity. Criminal activity puts the safety of prison administrators, guards and other inmates at risk. AR 750.05 allows prison staff to monitor inmate mail to uncover such criminal activity upon "reasonable suspicion." Since security and safety inside a prison is one of prison administrators' paramount concerns, *Thornburg*, 490 U.S. at 407-08, the monitoring provision satisfies this substantial and important governmental interest. As noted above, monitoring is not related to the suppression of expression because nothing is deleted or removed from the correspondence, and the mail is put into the mail stream once read. AR 750.05 is also generally necessary to protect legitimate government interests. As defendants correctly point out, the lack of a notice provision in AR 750.05 serves the legitimate government interests of keeping investigations secret until charges can be brought (#168, p. 33). There does not appear to be, and plaintiff has not identified, an alternative to keeping such a criminal investigation secret, and this court is required to afford considerable deference to the expertise of prison administrators. *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001). AR 750.05 is also narrowly tailored in that it does not authorize prison officials to read *all* outgoing mail – only mail from an inmate under "reasonable suspicion" of criminal activity may be read, and only upon approval from the warden.[10]

---

[10] Plaintiff contends that the term "reasonable suspicion" is too ambiguous to be valid. The court notes that this term is very common in Fourth Amendment jurisprudence, and rejects this argument.

The court concludes that the provisions of AR 750.05 are constitutional and grants summary judgment on count 5.

### 4. Count 6

In count 6, plaintiff alleges that defendants McDaniel and Farwell have opened and read privileged legal mail sent by his "co-plaintiffs" outside of plaintiff's presence in violation of AR 750 and his constitutional rights (#13, pp. 35-40). Defendants respond that plaintiff lacks standing to bring this claim on behalf of the mail recipients, Inmates Miller and Rodriguez, because neither inmate is a party to this case (#168, p. 35 and n. 134).[11]

#### (a) Standing

"Standing has constitutional and prudential dimensions." *Sahni v. American Diversified Partners*, 83 F.d 1054, 1057 (9th Cir. 1996). The prudential limitation requires that plaintiff "'assert his own rights, rather than rely on the rights or interests of a third party.'" *Id*. (*citing Wedges/Ledged of Cal., Inc. v. City of Phoenix*, 24 F.3d 56 (9th Cir. 1994)).

#### (b) Count 6 Analysis

Plaintiff's complaint is ambiguous, and it could be construed as an attempt to bring claims on behalf of his co-plaintiffs in another case, inmates Miller and Rodriguez (#13, p. 35, ¶ 83). To the limited extent that plaintiff is attempting to bring his claim on behalf of his "co-plaintiffs," summary judgment is granted to the defendants based on lack of prudential standing. *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1057 (9th Cir. 1996).

### 5. Count 7

In count 7, plaintiff claims that defendants MacArthur and D'Amico denied him adequate pain medication for a severe back injury during a one-month period in 2004 (#13, pp. 41-54).

---

[11] Defendants have withdrawn the substantive argument they made as to count 6 (#171).

Plaintiff alleges that he requested pain medication for "severe and debilitation [sic] pain resulting from a spinal injury incurred in a fall on January 1, 2004," and on the instruction of defendant MacArthur, he checked himself into the infirmary on March 10, 2004 to receive medication. *Id.* Plaintiff alleges that on March 19, 2004, defendant MacArthur ceased the medication without notice or replacement with comparable medication, leaving plaintiff to suffer from severe pain even through defendant MacArthur had access to comparable medication. *Id.* Plaintiff contends that although he was given Ibuprofen 800, it caused "severe stomach irritation and vomiting," and therefore, did not help. *Id.* Plaintiff alleges he reported this to the medical staff to no avail. *Id.* Plaintiff was placed on comparable medication on April 22, 2004 after he was transferred to another facility. *Id.*

Defendants assert that plaintiff had pre-existing back injuries and it was not clear in March 2004 that the pain in plaintiff's back was a result of a recent injury (#168, p. 35). Defendant MacArthur admitted plaintiff to the infirmary, gave him pain medications, and recommended an MRI, which the Utilization Review Panel ("URP") denied on March 16, 2004. *Id.* Defendant MacArthur viewed plaintiff's pain as "chronic" due to his pre-existing injuries, and since it is prison policy not to treat chronic pain with narcotics indefinitely, defendant MacArthur gave plaintiff a non-narcotic pain reliever, Ibuprofen 800. *Id.*, p. 36. After plaintiff was transferred to the orthopedic center in Carson City, he was finally approved by the URP for an MRI, which resulted in a diagnosis of a new back problem, with a surgical remedy in August 2004. *Id.* Defendant MacArthur argues that plaintiff could not diagnose his own condition, and that without the benefit of an MRI, which was initially denied by the URP, defendant MacArthur was not able to determine plaintiff's back condition. *Id.*, p. 37. Since defendant MacArthur did not have the benefit of a diagnosis, his conclusion that the plaintiff's pain was from old back injuries was

reasonable, as was his adherence to prison policy that chronic pain is not treated with narcotics. *Id*. In fact, defendant MacArthur attributes his own actions as setting in motion plaintiff's eventual back surgery, which demonstrates that defendant MacArthur was not deliberately indifferent to plaintiff's condition. *Id*. Finally, defendant MacArthur points out that plaintiff is a prior cocaine user and NDOC is especially careful about prescribing narcotics to such inmates. *Id*.

Plaintiff contends that during a physical on January 26, 2004, he informed defendant MacArthur of his back pain and told him that it was the result of a new injury that had occurred on January 1, 2004 (#176, p. 10). Moreover, plaintiff informed defendants MacAurthur of the injury on January 2, 2004, when plaintiff sent a medical kite. *Id*., p. 27. However, plaintiff contends that defendant MacArthur abruptly discontinued the pain medication without informing plaintiff he was going to do so; discharged plaintiff from the infirmary knowing he could not walk due to the pain; ignored plaintiff's pleas for more medication; continued to prescribe Ibuprofen although he knew it was ineffective and gave plaintiff painful side effect; knew of another combination of medication that would be helpful to plaintiff, but that he did not substitute this combination for the discontinued medication; and finally, failed to give plaintiff medication for his ten-hour bus transfer to Nevada State Prison on April 22, 2004. *Id*., pp. 10-12. Plaintiff additionally argues that defendant MacArthur's incorrect procedure led to the URP's initial denial of the MRI on March 16, 2004, which the defendant did not attempt to rectify until March 31, 2004, all the while allowing plaintiff to suffer. Finally, plaintiff claims that defendants have failed to produce the prison's policy which prohibits prescribing narcotics for a "long" period of time, and also fail to define what they mean by "long." *Id*., p. 27.

Defendants reply that this is merely a disagreement in medical treatment between plaintiff

and defendant MacArthur – plaintiff wanted narcotics that defendant MacArthur did not feel were prudent to provide (#181, p. 12).  Defendant MacArthur chose a more conservative course of treatment than plaintiff preferred.

### (a) Deliberate Indifference and Sufficiently Serious Harm

The Eighth Amendment prohibits the imposition of cruel and unusual punishments and "embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted).  In *Farmer v. Brennan*, 511 U.S. 825 (1994) the Supreme Court stated that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828, *citing Helling v. McKinney*, 509 U.S. 25 (1993), *Wilson v. Seiter*, 501 U.S. 294 (1991), and *Estelle*, 429 U.S. 97.  To establish an Eighth Amendment violation, a plaintiff's case must satisfy an objective standard -- that the deprivation was serious enough to amount to cruel and unusual punishment, and a subjective standard -- deliberate indifference.  *See Wilson v. Seiter*, 501 U.S. 294, 297-304 (1991); *see also Farmer*, 511 U.S. at 834.

The subjective standard of deliberate indifference for Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835, *quoting Whitley v. Albers*, 475 U.S. 312, 319 (1986).  The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id.* at 836.  It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate.  *Id.*  Mere negligence on the part of prison staff is not sufficient to prove deliberate indifference.  *Id*.

The objective standard, a "serious medical need," exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of

pain." *Estelle*, 429 U.S. at 104.  The Ninth Circuit's examples of serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citations omitted).  Prison medical staff do not violate the Eighth Amendment simply because their opinion concerning medical treatment conflicts with the opinion of the inmate-patient.  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

### (b) Count 7 Analysis

The evidence demonstrates that plaintiff had two back surgeries prior to his incarceration (#168, D-MSJ 127, 128, 170, and 180).  On March 3, 2004, plaintiff sent a medical "kite" requesting to see the doctor about pain in his lower back.  *Id*., D-MSJ 163.  Defendant MacArthur admitted plaintiff to the infirmary on March 10, 2004 and prescribed Valium and Roxicodone, which plaintiff took from March 10 to March 19, 2004.  *Id*., D-MSJ 147, 163, and 182-185.  On March 10, 2004, defendant MacArthur sent a request for an MRI to the URP; this request was denied on March 16, 2004.  *Id*., D-MSJ 147.  On March 19, 2004, plaintiff's narcotics were discontinued and he was discharged from the infirmary.  *Id*., D-MSJ 147.  Defendant MacArthur prescribed plaintiff IBU 800 on March 21, 2004.  *Id*., D-MSJ 183 and 185.

Between March 18 and April 8, 2004, plaintiff sent a total of eleven medical kites asking why his narcotics were to be discontinued, stating that he was suffering from severe back and leg pain, and requesting medication other than Ibuprofen, as it was not helping and it was making him sick.  *Id*., D-MSJ 152-162.  Defendant MacArthur either failed to respond or denied all of

33

plaintiff's kites.[12]

On April 22, 2004, plaintiff was transferred to Nevada State Prison for medical consult

with Dr. Long. *Id.*, D-MSJ 139. He was prescribed Phenylgesic upon arrival to relieve the pain

caused by the transport, Valium on April 22, 2004, and Baclofen and Indocin on April 28, 2004.

*Id.*, D-MSJ 146, 188. Dr. Long examined plaintiff on May 5, 2004. *Id.*, D-MSJ179-181. On

May 17, 2004, plaintiff was referred for an MRI, *see id.*, D-MSJ 145, which he received on June

2, 2004. *Id.*, D-MSJ 137. Plaintiff received surgery for a left L3-4 herniated disc on August 16,

---

[12] D-MSJ 161 (March 18, 2004) ("Dr. MacArthur: certain nurses are giving me a hard time getting my pain pill. I am in pain constantly so why should I have to almost beg certain nurses for a pain pill. This is the reason I came to the inf. in the first place.") (unanswered);

D-MSJ 162 (March 18, 2004) ("Dr. MacArthur: I was just informed by the nurse... that my pain meds are discontinued as of this date... What am I to do, just lay here in pain? Please advise.") (unanswered);

D-MSJ 160 (March 20, 2004) ("I am requesting that my pain medication started on 3-10-04 which expired on 3-19-04 be rewritten to stop this unnecessary and consistent pain that returned on 3-19-04"; defendant MacArthur's response: "No pain meds will be KOP'd by NDOP");

D-MSJ 159 (March 21, 2004) ("Please bring me IBU. The pain is becoming so intence [sic] until it is causing me to vomit. I already have an active prescription for 400 IBU KOP"; defendant MacArthur's response: "No KOP IBU by NDOP");

D-MSJ 158 (March 23, 2004) ("Dr. MacArthur: Why have I been discharged?? I cannot function. I can't stand the pain to simply attempt to relieve my bladder. I have not been able to even shower in the last five days. I've only been able to eat portions of 5 meals in as many days due to the pain kills my appetite. The pain also cause nausea and vomiting. Am I being denied treatment?"; defendant MacArthur's response: "Back pain will only be treated for a short time – you will not be on narcotics forever");

D-MSJ 156 (March 25, 2004) ("Three questions: 1) was I submitted for an MRI? 2) has approval been given? 3) who authorizes such procedures?"; defendant MacArthur's response: "M.R.I. ordered. Don't know about approval. Medical use committee in Carson");

D-MSJ 157 (March 26, 2004) ("Need to speak with nurse "Chris" ASAP about the ineffectiveness of the IBU 800 and how it compound [sic] my suffering by causing severe stomach pain and vomiting even with food") (unanswered);

D-MSJ 155 (March 27, 2004) ("I cannot tolerate this constant pain any longer. The IBU 800 causes more grief than relief. It feels as if I've been shot in the knee and my left leg is being twisted off at the hip. This pain is constant. If I stand, sit upright, or walk for more than five minutes, the pain is intensified tenfold. I need the codine [sic] at least twice a day to allow me to function and perform normal personal needs and then get some ... sleep at night until my back is fixed. This suffering is medically unethical. I am terminally bed ridden"; defendant MacArthur's response: "Noted- put you on orthopedic clinic list");

D-MSJ 154 (March 30, 2004) ("I need to see Dr. MacArthur! This constant pain is madning [sic]! Why must I suffer needlessly? I'm enduring 24-7 of hell!"; defendant MacArthur's response: "You had a short course of narcotics. That's it");

D-MSJ 153 (April 2, 2004) ("I cannot take the IBU 800! It makes me sick as a dog! Please give me the codine [sic] to help manage this pain!"; defendant MacArthur's response: "No narcotics");

D-MSJ 152 (April 3, 2004) ("Nurses advised I try Finogisic [sic] for pain") (unanswered).

34

2004.  *Id*., D-MSJ 143, 172-181.

Plaintiff has satisfied the objective standard of an Eight Amendment claim.  *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (a "serious" medical need includes "the presence of a medical condition that significantly affects an individual's daily activities" or "the existence of chronic and substantial pain").  Review of the pleadings and exhibits reveals that defendants do not deny that plaintiff was in substantial pain between March 19, 2004 and April 16, 2004.

Moreover, the court concludes there is an issue of fact as to whether defendant MacArthur acted with deliberate indifference.  Defendants first argue that defendant MacArthur was not able to tell without an MRI, which the URP initially denied, whether plaintiff's pain was chronic and the result of plaintiff's prior back injuries.  It is prison policy not to treat chronic pain indefinitely.  However, defendant MacArthur believed plaintiff's pain to be severe enough that he admitted plaintiff to the infirmary and placed him on a round of narcotics for a week beginning March 10, 2004.  Considering that plaintiff then proceeded to send eleven medical kites complaining of pain within a seventeen-day time period after defendant MacArthur stopped prescribing plaintiff pain medication, it is unclear why defendant MacArthur was not more responsive to plaintiff's complaints of pain other than to prescribe IBU 800.  Moreover, the court finds it curious that defendant MacArthur ignored plaintiff's complaints of nausea and vomiting resulting from the IBU 800.  Although they were available, defendant MacArthur admits he did not prescribe other non-narcotic pain relievers, such as Baclofen or Indocin, to plaintiff (#176, Ex. 135, Admission Responses 11-12, 43).  In addition, even though defendant MacArthur contends he was not able to diagnose plaintiff's back condition without an MRI, *see* #168, D-MSJ 152-162), it is clear from the notes made by other medical providers after plaintiff arrived at NSP that plaintiff was visibly in pain, walking "hunched over" with a "very slow" gait (D-MSJ 139).  After a mere physical

35

examination on May 5, 2004, Dr. Long concluded, without the benefit of an MRI, that plaintiff likely had "a herniated disc, with probably L3 nerve root deficit on the left, as shown by quad weakness," and recommended x-rays and an MRI.  D-MSJ 180.  During this time, plaintiff was being treated with pain relievers other than IBU 800.  D-MSJ 187-189.

This appears to the court to be more than a disagreement in opinion as to medical treatment.  Defendant MacArthur did not respond to plaintiff's continuous complaints of pain other than to prescribe him with a pain killer that defendant MacArthur was aware caused plaintiff severe side effects.  Since there is a material issue of fact as to whether defendant MacArthur's responses constitute a mere "lack of due care for the prisoner's interests or safety" or purposeful disregard of plaintiff's pain, *see Farmer*, 511 U.S. at 835, the court denies defendants' motion for summary judgment as to count 7.

### 6. Count 11

In count 11, plaintiff alleges that defendants McDaniel and Whorton violated his right to due process when they found him guilty of a disciplinary infraction for fighting in the absence of any evidence to support the charge (#13, pp. 76-80).  Plaintiff asserts that the "some evidence" standard for finding him guilty of a disciplinary infraction was not met because the event was admittedly "unwitnessed," and because plaintiff was a victim of the fight.  *Id.*

Defendants argue that the "some evidence" standard was met because "it takes two people to fight," that there is "some evidence" that plaintiff was part of the fight, and "such involvement presents a quantum of odds that he was not a mere victim" (#168, p. 38).   Additionally, defendants argue plaintiff did not report that he was "attacked" until after the investigation revealed that plaintiff was at fault, after which he changed his story.  *Id.*, pp. 38-39.

Plaintiff argues that "no shred of evidence was produced" to find him guilty of fighting

(#176, p. 29).  He contends that there were no witnesses to the fight and that no officer testified at his February 19, 2004 disciplinary hearing that they witnessed the fight, that there was no investigation conducted with a subsequent report finding plaintiff at fault for fighting because when plaintiff requested a copy of the report, he was not given one (#176, pp. 12-13, 28). Additionally, plaintiff contends that even the hearing officer noted that the charges were "ambiguous" because no one actually witnessed a fight, and simply disciplined both parties similarly.  *Id*.  Plaintiff contends that "testimony from a prison officer, without any corroborated or other evidence, is [not] enough to satisfy the 'some evidence' standard."  *Id*., p. 29.[13]

Defendants reply that merely because the fight was not witnessed does not mean the "some evidence" standard was not met (#181, p. 13).  Defendants argue that if "plaintiff's standard of requiring an eyewitness were the minimum bar on the 'some evidence' standard, prison officials would be impermissibly hamstrung in the efficient operations of their correctional facilities" because inmates generally will not inform on one another.  *Id*.

### (a) Due Process

An inmate's due process challenge of a prison disciplinary board's finding of a rule violation is reviewed pursuant to the "some evidence" standard.  *Hines v. Gomez*, 108 F.3d 265, 268 (9th Cir. 1997); *see also Superintendent v. Hill*, 472 U.S. 445 (1985).  "This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced... .'"  *Superintendent*, 472 U.S. at 455 (citations omitted).  Determination of whether the standard has been met "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the

---

[13] Plaintiff cites only non-controlling cases in support of this proposition.

disciplinary board." *Id*. at 455-456 (citations omitted).

### (b) Count 11 Analysis

A review of the evidence demonstrates that some sort of altercation occurred on February 1, 2004 between the plaintiff and his cell mate (#168, D-MSJ 190).[14]  On February 2, 2004, a hearing officer entered a not guilty plea for the plaintiff and referred the matter for further proceedings. *Id*., D-MSJ 191. The prison held a disciplinary hearing on February 19, 2004. *Id*., D-MSJ 192. Plaintiff pled not guilty to two charges and stated that his cell mate had attacked him and that he had not fought back. *Id*. It is undisputed that there were no witnesses to the fight. *Id*. The hearing officer relied on a "staff report identifying inmate Jones as one of the combatants involved in the fight," and found plaintiff guilty of one count of fighting. *Id*., D-MSJ 193. Plaintiff appealed the violation to defendant McDaniel, who responded, "It takes two people to fight. You never reported you were attacked until after an investigation revealed you had been at fault. The NOC will stand." *Id*, D-MSJ 196. Defendant Whorton similarly upheld the violation. *Id*., D-MSJ 197.

The court concludes that the defendants have not demonstrated that there was "some evidence" to support the disciplinary finding. "The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent*, 472 U.S. at 455-456. The fact that there were no witnesses to the fight is not what concerns the court. Correctional Officer Jacoby's February 1, 2004 notice of charges states

---

[14] The Notice of Charges dated February 2, 2004 states in full: "On February 1, 2004, I, Correctional Officer Alice Jacoby was assigned to unit 7 center. At approximately 10:35 AM Correctional Officer John Wilcox answered the call button for cell 7A13 which housed inmate Matthews, Derrick 29624# and inmate Jones, Christopher 50600#. We heard, "Get me out of this cell." The inmate sounded agitated and out of breath. I told Correctional Officers Wilcox and Patrick Summervold to go out on the A wing tier and stay by cell 7A13. I then called Sergeant Paul Hunt and advised him we had a cell fight in progress.

At approximately 10:45 AM medical arrived and evaluated the situation. Both inmates were removed from the unit. End Report."

38

that someone was heard over the call button in an agitated and out of breath manner saying "Get me out of this cell." *Id.*, D-MSJ 190. There is no evidence as to whether it was plaintiff or his cell mate who made this call. The only information contained in the initial report that would support a fight rather than an attack upon the plaintiff is the reporting officer's statement that, "we ha[ve] a cell fight in progress," which was based only on the intercom call by an unknown party. *Id.* Although it is not clear, this report appears the only evidence the hearing officer relied on during the February 19, 2004 hearing finding the plaintiff guilty of fighting. *Id.*, D-MSJ 193. Noticeably missing from the evidence is plaintiff's cell mate's version of the incident and whether either the cell mate or plaintiff was injured. There is such an absence of evidence that the initial report fails to include *any* information regarding the situation officers found once they arrived at the cell or thereafter.

In upholding the notice of charges, defendant McDaniel stated, "It takes two people to fight. You never reported you were attacked until after an investigation revealed that you had been at fault." *Id.*, D-MSJ 196. However, there is no evidence of any investigation before this court, nor does it appear that any investigation report or testimony regarding an investigation was presented to the hearing officer. Moreover, in contravention of defendants' contention that plaintiff failed to tell anyone he was attacked, plaintiff stated in a February 6, 2004 informal grievance that the prison celled him with "a known Ohio state prison system transfer with an assaultive history" who instigated an "unprovoked attack upon my person" (#7, Ex. 52).

While testimonial or photographic evidence is not necessary to meet the "some evidence" standard and although the "some evidence" standard is hard to overcome, in this case there does not appear to be *any* evidence of plaintiff's involvement in the fight other than "it takes two to fight." This is not enough. *See Burnsworth v. Gunderson*, 179 F.3d 771, 775 (9th Cir. 1999).

39

The court concludes that on the evidence currently before the court, there is a genuine issue of material fact as to whether plaintiff was attacked on February 1, 2004.  The court denies summary judgment on count 11.

### 7. Count 12

In count 12, plaintiff alleges that on April 22, 2004, defendant Roberts denied him the use of toilet facilities during a lengthy bus transport from one prison facility to another (#13, pp. 81-84).  Plaintiff contends that defendants have a policy whereby inmates are restrained in such a fashion so as to not allow for the removal of pants.  *Id*., p. 81.  Plaintiff alleges that the prison also removed the toilet seat and all toilet tissue from the prison bus bathrooms, and that there was urine splashed all over the toilet, which implicates health concerns.  *Id*., p. 82.  Plaintiff alleges he was in extreme pain because he needed to defecate, he was denied a request to exit the bus at Lovelock Correctional Center to relieve himself, he could not use the prison bus bathroom because of the above concerns, and as such, he soiled himself on the bus, which resulted in humiliation.  *Id*., pp. 82-83.

Defendant Roberts argues that the facts indicate that plaintiff chose not to use the lavatory in the rear of the bus during his transport from ESP to NSP (#168, p. 39).  Defendant Roberts contends plaintiff should not have been deterred by the lack of privacy on the bus because lack of privacy in prison is common.  *Id*.  Finally, defendant Roberts argues that the bus toilet was useable, and even if it was unsanitary and because the bus ride was less than one day, it does not rise to the level of conditions in other cases that have found Eighth Amendment violations.  *Id*., pp. 39-40, *citing Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005).

Plaintiff argues that the prison bus did indeed make stops during the transport, however, none was for a restroom break; instead, the bus stopped to pick up or drop off additional inmates

(#176, p. 14). Plaintiff further contends that there is adequate security in place to allow inmates to use the toilet facilities at each stop and to replace the toilet seat and tissue dispenser. *Id*., p. 15. Plaintiff contends that his only option was to either use the prison bus toilet with urine splashed on it and no tissue, or defecate in his underclothes as he did. *Id*., p. 15.[15]

### (a) Deliberate Indifference and Sufficiently Serious Harm

The Eighth Amendment standard was set our above in count 7. *See supra*, pp. 35-36. Additionally, the objective element of the Eighth Amendment analysis can be met by proving the deprivation of a "basic human need" or "'the minimal civilized measure of life's necessities'." *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994) (*quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Hoptowit v. Spellman*, 753 F2d 779, 783 (9th Cir. 1985) (denial of the "basic elements of hygiene" can constitute an Eighth Amendment violation). However, a temporary deprivation of basic needs does not constitute an Eighth Amendment violation. *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997).

### (b) Count 12 Analysis

The evidence reveals that while there are restrooms on prison transport buses, there are no toilet seats (#176, Ex. 141; *see also* #168, D-MSJ, p. 16). It is disputed as to whether prison buses have toilet tissue. *Compare* #176, Ex. 141, RFA Nos. 1, 9-10 *with* #13, p. 81.

The court notes that there is also an issue of fact as to whether the prison has an unwritten policy of denying inmates the opportunity to defecate on the prison transport bus. Plaintiff alleges

---

[15] Plaintiff additionally argues that count 12 also includes a substantive due process claim based on lack of privacy because of the clear plexiglass door on the toilet on the bus. *Id*., p. 14. Plaintiff argues that issues of fact exist as to whether, under evolving standards of decency, plaintiff should be forced to defecate in plain view of others. *Id*., p. 30. Careful review of plaintiff's complaint reveals that, aside from noting in parenthesis that the "securable door" on the prison bus toilet is "(clear plexi-glass)," there is no allegation of a lack of privacy anywhere in count 12 (#13, p. 81, ¶ 254). Complaining about the lack of privacy in attached prison grievances and bringing the issue up in a motion does not constitute a claim for relief under the Fourteenth Amendment. The court concludes that plaintiff has not stated a substantive due process claim.

41

in his complaint that defendants do not allow inmates to defecate on the bus (#13, p. 81).  His

contentions are supported by four affidavits from other inmates stating that the prison informs

prisoners that they should defecate prior to boarding the prison transport bus because they will

not be allowed to do so once on the bus (#168, D-MSJ 262-269).  On the other hand, defendants

have consistently stated that prisoners *are* permitted to defecate on prison transport buses.  *See*

#176, Ex. 141, RFA No. 8; Ex. 142, Response 3; *see also* #168, D-MSJ 270-276.  Defendants do

admit that while there is no policy *prohibiting* inmates to defecate on the bus,

> [b]owel movements on busses [sic] in [sic] discouraged because
> of the minimal capability of the toilet equipment to deal with solid
> waste.  Accordingly, inmates are encouraged to plan not to utilize
> the toilet for bowel movements because of the general
> unpleasantness it causes.  Accordingly, inmates are encouraged to
> utilize facilities before departure, and if the urge occurs in transit,
> to wait until the arrival at the next Institution for a bowel
> movement.

(#176, Ex. 142, Response 3).[16]

However, in this *particular* case, plaintiff admits that he was told by Correctional Officer

Lopez to use the bus bathroom after he requested and was denied permission to disembark at a

stop (#13, p. 82, ¶ 256).  Notwithstanding plaintiff's evidence, including the affidavits of other

prisoners, plaintiff has admitted *he* was not denied permission to defecate on April 22, 2004.

Thus, there is no material issue of fact here.

Therefore, the only question is whether the conditions in the prison bus bathroom

constituted an Eighth Amendment violation.  Considering the fact that there are no toilet seats,

there is a clear door, and even taking as true that there is urine splashed on the toilet and there is

no tissue paper, these facts do not rise to an Eighth Amendment violation.  The objective standard

___

[16] The court finds this policy reasonable considering the security concerns that accompany the transport of inmates between facilities and the limitations of the bus bathrooms.

is not met because while plaintiff may have incurred humiliation and some discomfort, he was not deprived of a "basic human need" because he *could have* used the bathroom despite its limitations.  The cases plaintiff cited are either not controlling or do not support his contentions.  *See* #176, pp. 29-30.  Indeed, the case cited by this court in its screening order allowing the plaintiff's claim to go forward is instructive in granting summary judgment.  In *Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir. 1995), the Ninth Circuit held that "[u]nquestionably, subjection of a prisoner to lack of sanitation that is severe or prolonged can constitute and infliction of pain within the meaning of the Eighth Amendment."  *Id*. at 1314.  The court went on to list a number of very severe cases; however, the court noted that the plaintiffs in *Anderson* had failed to prove that the sanitary limitations imposed upon them were more than temporary.  *Id*.  This is the case here as well, considering the prison transport is completed in under twenty-four hours.

Most important, however, is the fact that plaintiff has admitted a number of times that he did not use the prison bus facilities because he considered them unsanitary.  *See* #13, p. 85, ¶¶ 255-257; *see also* #176, p. 15, ¶ 75; *see also* #176, p. 30; *see also* #176, Ex. 141A, RFA No. 34; #168, D-MSJ 43, Plaintiff's Depo, pp. 16-17.  Although plaintiff did not like the choice he was given, he was in fact given the opportunity to use the facilities.  The court notes that there are many times in which citizens who are not imprisoned must make the same choice plaintiff did – whether to use less than desirable facilities when in need, wait until the next opportunity, or simply relieve themselves.  Plaintiff chose to defecate in his pants.  There is no Eighth Amendment violation here and the court grants summary judgment on count 12.

///

///

**III. CONCLUSION**

Based on the foregoing and for good cause appearing, the court concludes that:

Count 1: Plaintiff has not produced evidence of retaliatory motive and cannot meet elements two or three of his retaliation claim.  The court grants summary judgment as to count 1.

Count 2: Plaintiff's claim is not procedurally barred by the rule in *Hudson* and defendants have not demonstrated they are entitled to qualified immunity.  The court denies summary judgment as to count 2.

Count 3: Defendants are entitled to immunity pursuant to N.R.S. 41.032(2) because their actions in deducting funds from plaintiff's inmate account were discretionary.  The court grants summary judgment as to count 3.

Count 4: There is an issue of material fact as to whether defendant Lightsey had retaliatory motive in confronting the plaintiff and subsequently charging him with disciplinary violations; therefore, the court denies summary judgment for count four as to defendant Lightsey.  However, there is no evidence before the court demonstrating retaliatory motives by defendants McDaniel and Whorton; therefore, the court grants summary judgment for count four as to defendants McDaniel and Whorton.

Count 5: The provisions of AR 750.05 are constitutional.  The court grants summary judgment as to count 5.

Count 6: To the limited extent that plaintiff is attempting to bring his claim on his co-plaintiff's behalf, the court grants summary judgment based on lack of prudential standing.  Summary judgment is not otherwise granted as to count 6.

Count 7: A material issue of fact exists as to whether defendant MacArthur acted with

44

deliberate indifference.  The court denies summary judgment as to count 7.

Count 11: Defendants have failed to show that the "some evidence" standard was met with regard to plaintiff's February 19, 2004 disciplinary hearing.  The court denies summary judgment as to count 11.

Count 12: Plaintiff did not incur "serious harm" and was not denied rest room facilities during a prison bus transport.  The court grants summary judgment as to count 12.

As such, the court respectfully recommends that defendants' motion for summary judgment (#168/169) be:

**GRANTED** as to count 1; count  3; count 4 as to defendants McDaniel and Whorton; count 5; count 6 based on plaintiff's attempt to bring this claim on behalf of his co-plaintiffs; and count 12; and

**DENIED** as to count  2; count 4 as to defendant Lightsey; count 7; and count 11.

The parties are advised:

1.    Pursuant to 28 U.S.C.  § 636(b)(1)© and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

///

///

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the defendant's motion for summary

judgment (#238) be:

**GRANTED** as to count 1; count  3; count 4 as to defendants McDaniel and Whorton;

count 5; count 6 based on plaintiff's attempt to bring this claim on behalf of his co-plaintiffs;

and count 12; and

**DENIED** as to count  2; count 4 as to defendant Lightsey; count 7; and count 11.

**DATED:** March 29, 2007.

_____
**UNITED STATES MAGISTRATE JUDGE**

46